UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ROBERT NASH,<br><br>                              Petitioner,<br><br>v.<br><br>CHANCE ANDES, Warden,<br><br>                              Respondent. | Case No.:  3:25-cv-0977-JES-DEB<br><br>**ORDER:**<br><br>**(1) DENYING PETITION FOR A WRIT OF HABEAS CORPUS AND**<br><br>**(2) ISSUING LIMITED CERTIFICATE OF APPEALABILITY** |

Robert Nash ("Petitioner") is a state prisoner proceeding through counsel with a Petition for a Writ of Habeas Corpus filed under 28 U.S.C. § 2254. ECF No. 1. Petitioner challenges his judgment of conviction in San Diego Superior Court case number SCE371032 on three counts of committing a lewd act upon a child under the age of 14 in violation of Cal. Penal Code § 288(a), with true findings Petitioner committed the offenses against more than one victim pursuant to Cal. Penal Code § 667.61 (b),(c), and (e) and had substantial sexual contact with one of the victims as to one of the counts within the meaning of Cal. Penal Code § 1203.066(a)(8), for which, following resentencing, he is serving a term of 15 years to life. ECF No. 11-16 at 1-2; *see also* ECF No. 11-26, citing *People v. Nash*, 87 Cal. App. 5th 483 (Cal. Ct. App. 2023) (affirming judgment after resentencing). ///

Petitioner raises two claims for habeas relief, alleging trial counsel rendered ineffective assistance in failing to (1) investigate fact witnesses who would have undermined a key prosecution witness and (2) consult with an expert on suggestibility who would have explained how a child could make a false accusation. ECF No. 1 at 5, 7; *see also* ECF No. 1-2 at 6-38. Respondent has filed an Answer and lodged the trial record. ECF Nos. 10-11. Petitioner has filed a Traverse.[1] ECF No. 13.

## I.  FACTUAL HISTORY AND RELEVANT PROCEDURAL BACKGROUND

The following is taken from the state appellate court opinion affirming the judgment in *People v. Nash*, D073427 (Cal. Ct. App. Oct. 2, 2019). *See* ECF No. 11-16. The state court factual findings are presumptively correct and entitled to deference in these proceedings. *See Sumner v. Mata*, 449 U.S. 539, 545-47 (1981).

*The E.N. Incident*

On January 1, 2017, Nash, his wife, and other family members were watching a movie. Nash's niece, E.N., was then three years old. She sat on his lap and his wife sat next to him. Nash covered E.N. from the chest down with a blanket. Nash's wife saw Nash moving his hand around E.N.'s private area under the blanket and also saw what she called Nash's "horny drunken face." She immediately removed the blanket and saw Nash's right hand down the front of E.N.'s pants. Nash pulled his hand up to between E.N.'s "navel and her hipbone but his fingertips were still in her pants, like to the knuckle." Nash's wife screamed, "What the fuck," and ran out of the room. Nash did not say much to his wife that day; he instead slept. Nash's wife testified she was not intoxicated and she had made a New Year's resolution not to drink alcohol.

A day or two later, Nash told his wife the incident would not have happened if he had not been drunk. They both agreed not to drink alcohol anymore. Days later, Nash's wife recorded him on her cell phone as they argued about the incident. Nash said, "I've explained it to you a hundred—

---

[1] Although this case was referred to United States Magistrate Judge Daniel E. Butcher pursuant to 28 U.S.C. § 636(b)(1)(B), the Court has determined that neither a Report and Recommendation nor oral argument are necessary for disposition of this matter. *See* S.D. Cal. CivLR 71.1(d).

25-cv-0977-JES-DEB

ten different ways to how that shit did not matter and it wasn't her and there was nothing there and it wasn't a child. And it was stupid and I was fucking drunk and maybe if you fucking would have put out more, it never would've fucking happened, how about that? How about if my wife actually would have had sex with me more than fucking once a month . . . that shit never might have fucking never happened." Nash added, "It wasn't her, it wasn't a child, it had nothing to do with anything. I fucked up, I was drunk and there was nothing there. There was no fucking significance, there was no heart, there was no nothing, there was just me being stupid and being fucking drunk and I'm fucking sorry."

In January 2017, different witnesses heard Nash make similar statements about the incident. One person heard Nash say, "I fucked up, I am an asshole." After one of Nash's brothers learned about the incident from Nash's wife, he became mad and fought with Nash. Both the mother and stepmother of Nash's wife heard Nash angrily protest that his wife was "making a big deal out of nothing," as E.N. was young and would not remember the incident.

*The K.T. Incident*

K.T.'s father testified that in April 2017, he had a house party and invited Nash, who was his coworker. That night, when K.T.'s father went inside the living room to send the children to sleep, he saw Nash laying on a couch and covered with a blanket. K.T., who was then five years old, was sitting next to him. About three weeks later, K.T. told her father that Nash had stuck his hands down the front of her pants, touching her vagina in a "wiping motion." Nash also stuck his hand down the rear of her pants, grabbing her buttocks. K.T. said she was uncomfortable with Nash's touching.

On May 31, 2017, a social worker conducted a forensic interview of K.T., a video recording of which was played for the jury. K.T. told the social worker that her father's coworker had a beard. According to K.T., the coworker told her to hide under the blanket, then he put his hand in her pants. K.T. demonstrated a wiping motion with her index finger in her vaginal area.

At trial, K.T. testified that one of Nash's coworkers, who she identified by his beard, touched her vagina while they lay underneath a blanket. K.T. demonstrated by moving her index finger back and forth. She said, "He gave me a scratch." K.T. said that the coworker also touched her buttocks and legs.

K.T.'s brother, who was 13 years old at the time of the incident, testified he was watching television on one side of a couch with Nash when K.T. came and hugged Nash, who put a blanket over her. He saw Nash move around under the blanket for a few minutes. Afterwards, when K.T. got up, she fixed her pants.

Nash's counsel argued in closing that the prosecution had not adduced evidence to show Nash was guilty of the charged crimes: "So if I look at this case correctly, I see no child that identifies my client as the perpetrator. I'm not sure that it ever happened with K.T. And as far as the E.N. situation is concerned, you have a situation where the complaining party never actually saw the touching in that area or that it was sexually minded."

Nash's counsel also argued Nash was intoxicated during the E.N. incident: "I know what (Nash) was doing and you know what he was doing on New Year's Eve, and that was drinking, drinking probably until after midnight, up all night drinking." Defense counsel continued, "Well, we know that (Nash's wife) testified that she didn't stop drinking until the New Year's resolution, so we know that she probably drank that night, and if she drank that night, (Nash) probably drank that night, too, plus when he says I was drunk, that's pretty good evidence that he had too much to drink."

The probation report stated Nash, who was 33 years old, had an above average risk of reoffense as he scored a "four" on the Static-99R, an actuarial measure of risk for sexual offense recidivism. K.T.'s parents were attempting to obtain counseling for her. The probation officer recommended Nash be sentenced to 45 years to life in prison.

The court refused to impose section 667.61 subdivision (b)'s mandatory 15-year-to-life sentence, finding that doing so would constitute cruel or unusual punishment under the California Constitution. It reasoned the mandatory sentence would be grossly disproportionate to Nash's individual culpability. In discussing the nature of the offense, the court stated Nash "was substantially intoxicated on both occasions. The molests likely involved 'skin to skin' contact of the vaginal area of (E.N.) and the vaginal and buttocks areas of (K.T.). There was little evidence (and certainly no medical evidence) to suggest any type of penetration. There was no credible evidence of 'masturbation' as understood in a traditional sense. But there may have been rubbing of the vaginal and/or buttocks area of each victim that would constitute 'masturbation' under the legal definition. . . . (¶) There was minimal evidence to suggest any physical injury to either child as a result of the

25-cv-0977-JES-DEB

touching. There was no evidence to suggest that either child had touched (Nash) or had been encouraged to do so. At the time of the molests, there was no indication from either victim, by word or action, that any type of inappropriate touching had taken place."

In analyzing the "nature of the offender," the court pointed out Nash had suffered two driving under the influence convictions. It concluded, "What escalates this case to a 'life top' status is the fact that (Nash) stands convicted of touching two separate minor victims. In essence, that fact, and that fact alone, (w)rests from the trial court any opportunity to fashion a determinative prison term that meets the sentencing objectives of both the legislative and judicial branches of government. The implementation of a 'one size fits all' sentencing scheme on the facts of this case results in punishment, that by any objective standard, is cruel or unusual and shocks the conscience."

ECF No. 11-16 at 3-7.

On January 10, 2018, Petitioner was sentenced to a total term of 10 years in prison, comprising of 6 years for count 1, 2 years for count 2, and 2 years for count 3, with the terms for counts 2 and 3 each running consecutive to the prior terms. ECF No. 11-12 at 32-33; *see also* ECF No. 11-1 at 242.

Petitioner thereafter appealed his judgment of conviction, raising two claims not presented in the federal Petition, a claim of ineffective assistance for failure to request a jury instruction on voluntary intoxication and a claim of trial court error for limiting cross-examination of Petitioner's wife about her personal history. ECF No. 11-13. In response, Respondent addressed those claims and additionally contended the sentence imposed in Petitioner's case was unauthorized and a sentence of 15 years to life was mandatory. ECF No. 11-14. On October 2, 2019, the California Court of Appeal affirmed the conviction but vacated Petitioner's sentence and remanded to the trial court for resentencing.[2] ECF No. 11-16. On December 18, 2019, the California Supreme Court denied Petitioner's subsequent petition for review. ECF Nos. 11-17, 11-18.

---

[2] Petitioner was subsequently resentenced to a term of 15 years to life, which on January 13, 2023, the California Court of Appeal affirmed as constitutional. ECF No. 11-24.

25-cv-0977-JES-DEB

On May 19, 2021, while Petitioner's case was pending in the trial court for resentencing, Petitioner filed a habeas petition in the superior court in which he raised the same two claims of ineffective assistance now presented in the federal Petition. ECF No. 11-19. The superior court subsequently issued an order to show cause and ordered an evidentiary hearing be held on the matter. ECF No. 11-23 at 5-6, 11-12, 15-20. After holding an evidentiary hearing, ECF No. 11-21, the superior court denied the habeas petition on February 10, 2023, in a reasoned decision. ECF No. 11-22; *see also* ECF No. 11-23 (superior court habeas orders). Petitioner thereafter filed a habeas petition in the state appellate court again raising the same claims now presented in the federal Petition, *see* ECF No. 11-25, which on July 31, 2023, the California Court of Appeals denied in a reasoned decision. ECF No. 11-26. Petitioner subsequently presented these same claims in a habeas petition to the California Supreme Court, ECF Nos. 11-27 through 11-31, which that court summarily denied on April 24, 2024, stating in full: "The petition for writ of habeas corpus is denied." ECF No. 11-32.

On April 22, 2025, Petitioner filed a federal habeas Petition raising two claims for relief. ECF No. 1. On September 24, 2025, Respondent filed an Answer in response to the Petition and lodged the state court record. ECF Nos. 10-11. On October 12, 2025, Petitioner filed a Traverse. ECF No. 13.

## II.    STANDARD OF REVIEW

A federal habeas petitioner cannot obtain federal habeas relief on a claim that the state court adjudicated on the merits unless the petitioner is first able to show that the state court adjudication: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." *Harrington v. Richter*, 562 U.S. 86, 97-98 (2011), quoting 28 U.S.C. § 2254(d)(1)-(2). Additionally, even in a situation where section 2254(d) is satisfied or does not apply, a reviewing habeas court must still determine whether the petitioner has established a federal

constitutional violation. *See Fry v. Pliler*, 551 U.S. 112, 119 (2007) (§ 2254(d) "sets forth a precondition to the grant of habeas relief . . . , not an entitlement to it."); *see also Frantz v. Hazey*, 533 F.3d 724, 735-36 (9th Cir. 2008) (en banc).

A decision is "contrary to" clearly established law if "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 413 (2000). A decision involves an "unreasonable application" of clearly established federal law if "the state court identifies the correct governing legal principle . . . but unreasonably applies that principle to the facts of the prisoner's case." *Id.*; *Bruce v. Terhune*, 376 F.3d 950, 953 (9th Cir. 2004). With respect to section 2254(d), "[t]he question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable– a substantially higher threshold." *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007), citing *Williams*, 529 U.S. at 410. "State-court factual findings, moreover, are presumed correct; the petitioner has the burden of rebutting the presumption by 'clear and convincing evidence.'" *Rice v. Collins*, 546 U.S. 333, 338-39 (2006), quoting 28 U.S.C. § 2254(e)(1). In a federal habeas action, "[t]he petitioner carries the burden of proof." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011), citing *Woodford v. Visciotti*, 537 U.S. 19, 25 (2002) (per curiam).

"A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Richter*, 562 U.S. at 101, quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004). "If this standard is difficult to meet, that is because it was meant to be. As amended by AEDPA, § 2254(d) stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings. . . . It preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [the Supreme] Court's precedents." *Richter*, 562 U.S. at 102.

///

25-cv-0977-JES-DEB

### III.    DISCUSSION

Respondent maintains habeas relief is unavailable because the state court's rejection of both Claim 1 and Claim 2 was neither contrary to nor an unreasonable application of clearly established federal law nor was either denial based on an unreasonable factual determination. *See* ECF No. 10 at 2; *see also* ECF No. 10-1 at 6, 16, 23. Petitioner asserts trial counsels' decisions cannot be considered as "reasonably tactical" and the state court's contrary conclusion was unreasonable. *See* ECF No. 13 at 10.

### A.    Ineffective Assistance of Counsel- Standard

"[A] defendant must show both deficient performance by counsel and prejudice in order to prove that he has received ineffective assistance of counsel." *Knowles v. Mirzayance*, 556 U.S. 111, 122 (2009), citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984). "Surmounting *Strickland*'s high bar is never an easy task." *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010). "When a convicted defendant complains of the ineffectiveness of counsel's assistance, the defendant must show that counsel's representation fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 687-88. Further, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id.* at 689 (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)). To demonstrate prejudice, a petitioner must show "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* "The likelihood of a different result must be substantial, not just conceivable." *Richter*, 562 U.S. at 112. Moreover, when a federal habeas court is reviewing a claim of ineffective assistance of counsel previously adjudicated on the merits by a state court:

> The pivotal question is whether the state court's application of the *Strickland* standard was unreasonable. This is different from asking whether defense

counsel's performance fell below *Strickland*'s standard. Were that the inquiry, the analysis would be no different than if, for example, this Court were adjudicating a *Strickland* claim on direct review of a criminal conviction in a United States district court. Under AEDPA, though, it is a necessary premise that the two questions are different. For purposes of § 2254(d)(1), "an *unreasonable* application of federal law is different from an *incorrect* application of federal law." *Williams*, *supra*, at 410, 120 S.Ct. 1495. A state court must be granted a deference and latitude that are not in operation when the case involves review under the *Strickland* standard itself.

*Richter*, 562 U.S. at 101. "When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id.* at 105.

## B.      Relevant State Court Decision

Petitioner raised both Claims 1 and 2 in a habeas petition in the California Supreme Court, which that court denied without a statement of reasoning. *See* ECF Nos. 11-27, 11-32. Petitioner previously raised both claims in a habeas petition in the California Court of Appeal, ECF No. 11-25, which denied his claims in a reasoned decision. *See* ECF No. 11-26 at 2-5. The United States Supreme Court has repeatedly stated a presumption exists "[w]here there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the same claim rest upon the same ground." *Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991); *see also Wilson v. Sellers*, 584 U.S. 122, 128 (2018) ("We conclude that federal habeas law employs a 'look through' presumption.") Given the absence of record evidence or argument seeking to rebut this presumption, the Court will "look through" the state supreme court's summary denial of his claims to the reasoned decision issued by the state appellate court as to Claim 1 and Claim 2, respectively.[3] *See* ECF No. 11-26 at 2-5; *see Ylst*, 501 U.S. at 804 ("The essence

---

[3] Respondent appears to invite the Court to additionally "look through" the appellate court's decision, which was based on prejudice alone, *see* ECF No. 11-26 at 2-5, to the superior court's reasoning with respect to trial counsel's performance as to both claims. *See* ECF

of unexplained orders is that they say nothing. We think that a presumption which gives them *no* effect- which simply 'looks through' them to the last reasoned decision- most nearly reflects the role they are ordinarily intended to play.") (footnote omitted).

### C.    Petitioner's Claims

Again, Petitioner presents two claims for habeas relief, alleging: (1) trial counsel rendered ineffective assistance in failing to investigate fact witnesses who would have undermined a key prosecution witness and (2) trial counsel rendered ineffective assistance by failing to consult with an expert on suggestibility who would have explained how a child could make a false accusation. ECF No. 1 at 5, 7; *see also* ECF No. 1-2 at 6-38.

### 1.    Claim 1

Here, Petitioner alleges trial counsel rendered ineffective assistance in failing to investigate fact witnesses who would have undermined a key prosecution witness. ECF No. 1 at 5. Specifically, Petitioner contends trial counsel failed to interview Nicole Toth or Drew McGruder, both of whom "could have powerfully buttressed the defense that the key prosecution witness as to E.N. had a motive to lie" and that "[w]ithout their testimony, Joy's testimony came in virtually unchallenged." ECF No. 1-2 at 23-24.

As discussed above, the Court looks to the decision of the state appellate court rejecting this claim and reasoning in relevant part as follows:

> By failing to provide us with a copy of the evidentiary hearing transcript, Nash makes it difficult to review his claims based on that evidence or to determine whether the superior court's factual findings are supported by the evidence. Regardless, we agree with the superior court that even if we presume Nash's trial counsel's performance was deficient, he fails to establish he was prejudiced because there is no reasonable probability of a different result.

///

No. 10-1 at 21 (Claim 1) and 27 (Claim 2). The Court declines to do so, given the state appellate court's decision was the "last reasoned decision" on both Claim 1 and Claim 2. *See Ylst*, 501 U.S. at 804; *see also id.* at 805 ("To decide the present case, therefore, we begin by asking which is the last *explained* state-court judgment on the [] claim.")

> Regarding the testimony of Nash's wife regarding E.N., our opinion on direct appeal already found no error by the trial court in excluding evidence of his wife's history of excessive drinking and her own molestation earlier in life. Most importantly, we concluded that even if we presume the jury would have entirely discredited her testimony based on different evidence, there was no probability of a different result because "abundant evidence supported the convictions" and "[s]everal people heard Nash admit he touched E.N., but minimize it, claiming she was a child who would not remember anything."

> We see no basis on which to revisit this conclusion that there was no probability of a different result when Nash admitted his wrongdoing to multiple people.

ECF No. 11-26 at 4-5.

In rendering this decision, the state appellate court relied on the factual findings of the superior court when that court announced its own ruling denying the petition following the evidentiary hearing (as again, the appellate court noted it had not been provided with a copy of the evidentiary hearing transcript). *See id.* at 3. Petitioner does not appear to challenge or attempt to rebut the presumption of correctness the Court must accord to the state court factual findings. *See Rice*, 546 U.S. at 338-39 ("State-court factual findings, moreover, are presumed correct; the petitioner has the burden of rebutting the presumption by 'clear and convincing evidence.'"), quoting 28 U.S.C. § 2254(e)(1). With respect to the two witnesses, Nicole Toth and Drew McGruder, the superior court found as follows:

> Ms. Toth was not present during the alleged molestation. She would have been a character witness. She testified that her children were around the Petitioner and there was never any cause for concern . . . She also testified that Joy Hawkins drank all the time . . . Joy was molested as a kid . . . Also, that Joy wanted to get away from the Petitioner and had accused another man of the same situation. Also that Joy wanted to get the kids from the Petitioner . . . However, she did testify that Joy told her that she did see the Petitioner with E.N. and saw his hand move fast from the top of her pants, . . ."

> …

> Mr. McGruder testified, but he was not present during the alleged molest. He would have been a character witness. He testified that he has known the Petitioner since 17 years old and that the Petitioner was not attracted to small

25-cv-0977-JES-DEB

children . . . He testified that Ms. Hawkins was not the best mother, . . . Also he testified that people did learn at Semper about the accusation of molest because of investigators who came to the workplace, . . . However, there was no testimony that the father of K.T., who worked at Semper, knew of the allegation.

ECF No. 11-22 at 7-8.[4]

As the state court reasonably found, both Toth and McGruder were character witnesses and neither individual was present during the E.N. incident. Both individuals would have testified about Petitioner's good character and each witness would have also provided negative character evidence about Joy, including her alcohol use and that she "was not the best mother." ECF No. 11-22 at 7-8. While Toth would also have testified that Joy "wanted to get the kids from the Petitioner," Toth acknowledged that Joy told her about what Joy saw, stating "that she did see the Petitioner with E.N. and saw his hand move fast from the top of her pants." *Id.* at 7.

Upon review, the Court agrees with and finds reasonable the state court's conclusion that additional evidence concerning Joy's character would not have made a difference to the outcome of the trial proceedings, much less presented a "reasonable probability" of another result. *Strickland*, 466 U.S. at 694. This is because the most arguably compelling portion of the now proffered evidence, that concerning Joy's potential motive for making up the allegations, was already before the jury to consider. Amber Washam, Petitioner's former partner and the mother of two of his children who co-parented and was friends with both Joy and Petitioner, testified at trial that Joy had previously said she wanted to "leave and take the girls with her" and Amber told Joy that Petitioner "would fight her for the kids." ECF No. 11-8 at 89-93. An additional witness offering a similarly vague assertion that Joy wanted to get herself and her children away from Petitioner does not clearly or

---

[4] In recounting the evidentiary hearing testimony of these two witnesses, the superior court repeatedly cited to the hearing transcripts by page and line number. *See id.* at 7-8. For ease of reference and readability, the Court has removed those references and citations.

directly lend itself to an inference that Joy was likely to have invented allegations of molestation against Petitioner, much less that she did so.[5]

Petitioner cites to and relies upon three Ninth Circuit cases, *Vega v. Ryan*, 757 F.3d 960 (9th Cir. 2014), *Hart v. Gomez*, 174 F.3d 1067 (9th Cir. 1999), and *Cannedy v. Adams*, 706 F.3d 1148 (9th Cir. 2013), in support of his contention that "[t]he failure to investigate and present powerful corroborating evidence impeaching the key prosecution witness amounted to ineffective assistance of counsel." ECF No. 1-2 at 28-30. But upon review, the Court finds all three cases factually distinguishable from the situation presented here.

First, *Vega* involved a *recantation* by the complaining victim to a third party, a priest, who would have corroborated the victim's mother's trial testimony that the victim had also recanted to her on another occasion. *See Vega*, 757 F.3d at 973 ("The fact that a victim recants in front of two people may make the testimony of one witness cumulative to the testimony of the second witness. But when the victim recants on two separate occasions to two different people, it is harder to describe the testimony of the second witness as merely cumulative of the first.") In that case, the Ninth Circuit found prejudice arising from trial counsel's failure to investigate and present the witness, citing the difficulty the jury had in reaching a verdict and reasoning in part that the unpresented testimony "would have undermined the prosecution's argument that the victim's mother had pressured her to recant in order to protect Vega (her husband), because the victim independently recanted—in private—to a priest who had no reason to pressure her." *Id.* at 974. *Vega*, unlike the instant case, involved powerful recantation evidence from a neutral party (a priest, no less)

---

[5] As to the superior court's reference to Joy having "accused another man of the same situation," *see* ECF No. 11-22 at 7, Petitioner acknowledges those accusations involved a man Joy married *after* Petitioner and thus could not have been part of Petitioner's trial because the alleged events in question took place well after his trial proceedings. *See* ECF No. 1-2 at 14. Petitioner also acknowledges those allegations were excluded from the superior court's order to show cause and were not part of his habeas proceedings, again because they occurred after Petitioner's trial. *See id.*

25-cv-0977-JES-DEB

which would have clearly impacted the likelihood of a different outcome given that evidence directly concerned the veracity of the allegations in that case. Petitioner, meanwhile, offers additional character witnesses who would have given positive character testimony about Petitioner, negative character testimony about Joy, and would have at best, corroborated Joy's possible motive or reason to have made up allegations against Petitioner, but would not have provided any direct evidence as to the truth or falsity of her allegations or testimony.

*Hart*, meanwhile, also concerned evidence that would have directly undermined the victim's accusations, as the victim in that case testified that her father had molested her during trips they took to a camping resort between September 1986 and August 1987 and "testified specifically that Hart never molested her during visits on which he was accompanied by another adult." *Hart*, 174 F.3d at 1068. The trial defense presented testimony from the petitioner's girlfriend, who was dating him during that entire time period and who stated she had accompanied him and his children on every camping trip, but the defense failed to present the "extensive and detailed records" the witness had to support her testimony, including credit card receipts for lodging and groceries and her personal calendar. *Id.* While there was evidence that the petitioner had in a phone call and letter "admit[ted] that he had, at some point in the past, sexually molested his daughter" prior to 1986, the Ninth Circuit found prejudice from the failure to present the records at issue, which "provided remarkably strong corroboration for her otherwise uncorroborated testimony" concerning the period of time when the alleged molestation charged in the case had occurred. *Id.* at 1072-73. Like with *Vega*, the evidence trial counsel failed to offer in *Hart* went directly to the veracity of the victim's allegations and is again readily distinguishable from the evidence at issue here, which again went primarily to Joy's character and offered corroboration only of Joy's potential motive for making allegations against Petitioner, rather than any direct evidence as to the truth of those allegations.

///

25-cv-0977-JES-DEB

Third and finally, while Petitioner contends that *Cannedy* involves a situation where "trial counsel rendered ineffective assistance where he did not present witnesses who could have corroborated why the complaining witness had a motive to lie about her alleged molestation," ECF No. 1-2 at 29, that case, like *Vega* and unlike the instant case, also involved direct evidence of false allegations rather than simply a potential motive for such. In *Cannedy*, the petitioner, who was accused of molesting his stepdaughter, denied the accusations and "hypothesized" that the victim "harbored animosity toward him" because she opposed moving plans. *Cannedy*, 706 F.3d at 1153. Meanwhile, a friend of the victim who was available and would have testified the victim's online profile "stated that she made up the claims of molestation against (Petitioner) because she wanted to move to her natural father's home in Northern California where she was more happy and had more friends" was not investigated or called to testify. *Id.* at 1154. The Ninth Circuit found prejudice, reasoning that "[t]he message was powerful evidence that [the victim] had fabricated her allegations of abuse" and that "[i]t is difficult to imagine any evidence that could have been more exculpatory for Petitioner than the alleged victim's broad recantation of her accusations," particularly in view of the lack of physical evidence, the "significant inconsistencies" in prosecution witnesses' testimony and the "critical corroboration" the evidence would have provided to petitioner, who was the "lone defense witness." *Id.* at 1164. Again, unlike the powerful and direct exculpatory evidence at issue in *Cannedy*, Petitioner instead offers character evidence and corroboration of a potential motive Joy had for making allegations against Petitioner but provides no direct evidence that Joy's accusations were false or fabricated.

In this case, neither proffered witness was present on the night of the incident, and thus, neither witness could provide any direct evidence as to the veracity of Joy's allegations. Additionally, Joy had been subjected to extensive cross-examination at trial concerning her account of events, her own actions on the evening in question and the days and weeks surrounding the incident, and her credibility. This included Joy's admission that several weeks after the E.N. incident, she started to have sex with Petitioner but then

15

25-cv-0977-JES-DEB

stopped, shortly before confronting him about the incident and recording his responses. ECF No. 11-5 at 115. Joy also testified as to her recollection and account of events, which included her concession that E.N. looked "like it was normal" and "didn't even notice" during the incident itself and that Petitioner later "didn't act like he remembered" that evening. *Id.* at 121, 132. Joy also admitted she had a hangover earlier that day and started drinking again a few weeks afterwards. *Id.* at 119-20. Joy also admitted she had a desire to move the family and "all the kids" to Arizona after an incident where Petitioner headbutted her. *Id.* at 125-26. Joy also acknowledged she did not make any complaint to CPS either about her own children or about E.N., but she instead spoke to CPS when they contacted her. *Id.* at 132-33. Joy also stated that she "wouldn't mind" if Petitioner "wants supervised visitation if he got convicted." *Id.* at 135. Several witnesses also testified about the inconsistencies in Joy's account of the incident over time. *See e.g.* ECF No. 11-8 at 95-96 (Amber Washam testified Joy first told her she saw "his hand under the pants," while "[t]he second time she had told me that she saw his hand on top of the pants," and during the third conversation several weeks later, Joy told Amber the fingers were under the pants but the thumb was outside.); *see also* ECF No. 11-9 at 33 (Petitioner's mother Christi Nash testified that Joy told her "a different story" on two occasions through text messages, that: "She told me that she saw his thumb in her waistband like this the second time. The first time she told me she said that his hand was on the outside of [E.N.'s] shorts.")

Given the indirect nature of the proffered impeachment evidence and in view of Joy's cross-examination and the other noted inconsistencies discussed above, the Court finds little likelihood additional attacks on Joy's credibility would have affected the outcome of the proceedings, much less that they would have had any reasonable probability of a different result at trial. *See Strickland*, 466 U.S. at 694 ("A reasonable probability is a probability sufficient to undermine confidence in the outcome."); *see also Richter*, 562 U.S. at 112 ("The likelihood of a different result must be substantial, not just conceivable.")

Moreover, contrary to Petitioner's contention that "[t]he prosecution's case as to E.N. rose and fell on [Joy's] account," ECF No. 1-2 at 26, the Court finds quite compelling

16

not only Petitioner's own statements and admissions, made to Joy and several others, but also the striking similarities between the E.N. incident and the one involving K.T.[6] First, as to Petitioner's statements, the state court aptly observed Petitioner made statements to both Joy and to other individuals, noting as follows:

> His wife later recorded a telephone conversation in which Nash admitted "it was stupid and I was fucking drunk and maybe if you fucking would have put out more, it never would've fucking happened, how about that? How about if my wife actually would have had sex with me more than fucking once a month . . . that shit never might have fucking never happened." Other witnesses heard Nash make similar statements and accuse his wife of "'making a big deal out of nothing,' as E.N. was young and would not remember the incident."

ECF No. 11-26 at 2. Second, with respect to the similarities between the two incidents, the state superior court observed: "The Petitioner used the same modus operandi. He had a blanket covering them. He touches them on the vagina, and he consumes alcohol." ECF No. 11-22 at 12. Petitioner's brother Steven also testified that during rides to work, he and Petitioner "went over" Petitioner's defense "to build his case for how he can get his girls back," to which Petitioner stated that Joy had "been looking for a reason to leave, and she

---

[6] Petitioner extensively argues that without Joy's testimony, his conviction as to the E.N. charges "could not stand" because his own remarks, even if considered a confession, "would not on their own" support conviction due to California's corpus delicti requirement. *See* ECF No. 1-2 at 25-26 and n.9, citing *People v. Alvarez*, 27 Cal. 4th 1161, 1168-69 (2002) (holding that the prosecution must prove "the body of the crime itself" and "cannot satisfy this burden by relying *exclusively* upon the extrajudicial statements, confessions, or admissions of the defendant.") Yet, in addition to the *Alvarez* Court's own explicit statement that: "It is undisputed that the corpus delicti rule is not a requirement of federal law," *id.*, 27 Cal. 4th at 1173, this Court remains bound by the state appellate court's determination in this case that "abundant evidence supported the convictions," ECF No. 11-26 at 5, and the state court's specific reliance upon its own earlier decision on direct appeal. *See Bradshaw v. Richey*, 546 U.S. 74, 76 (2005) ("We have repeatedly held that a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus."), citing *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) and *Mullaney v. Wilbur*, 421 U.S. 684, 691 (1975). Thus, the Court must abide by the state court's conclusion that the evidence in Petitioner's case satisfied state law evidentiary requirements.

25-cv-0977-JES-DEB

couldn't necessarily pin, you know, some kind of, you know, I guess molestation or allegation on one of her own daughters, so she used one of the nieces so she can just pick up and go, and while [Petitioner] was caught in the wake of this, that she would be able to get out of here." ECF No. 11-7 at 51-52. Steven stated he had not heard this information from Joy, only Petitioner, and while he "figured [the statements] to be truthful," he later told others that he questioned whether Petitioner was "trying to convince me or himself of what's going on." *Id.* at 53. Joy's stepfather Paul Enkhorn and district attorney investigator Bryan Zmijewski each testified Steven separately told them Petitioner, during their drives to work, was rehearsing or "going over" Petitioner's own made up "story" that Joy wanted to take the girls and made up the allegations against Petitioner for that purpose. *Id.* at 87-88 (Enkhorn's testimony); *id.* at 99-100 (Zmijewski's testimony).

Upon review and for the reasons discussed above, Petitioner fails to show the state court decision was contrary to or an unreasonable application of clearly established federal law under *Strickland*. *See Richter*, 562 U.S. at 101 ("The pivotal question is whether the state court's application of the *Strickland* standard was unreasonable."); *see also Mirzayance*, 556 U.S. at 122 ("[A] defendant must show both deficient performance by counsel and prejudice in order to prove that he has received ineffective assistance of counsel."), citing *Strickland*, 466 U.S. at 687. Nor has Petitioner claimed or shown that the state court's rejection of his claim was based on an unreasonable factual determination. Accordingly, federal habeas relief is not available on Claim 1.

### 2.    Claim 2

Petitioner next asserts trial counsel rendered ineffective assistance by failing to consult with an expert on suggestibility who would have explained how a child could make a false accusation. ECF No. 1 at 6. Specifically, Petitioner contends that counsel's "decision to forego investigation of a suggestibility defense or introduce expert testimony and instead pursue a weak and risky third[-] party culpability defense (itself lacking investigation) was deficient performance that resulted in prejudice" and the state appellate court's contrary conclusion was unreasonable. ECF No. 1-2 at 31.

The Court again looks to the decision of the state appellate court, which rejected this contention, reasoning in relevant part as follows:

> [W]e agree with the superior court that even if we presume Nash's trial counsel's performance was deficient, he fails to establish he was prejudiced because there is no reasonable probability of a different result.
>
> …
>
> Similarly, even if Nash's counsel had introduced additional evidence regarding the suggestibility of K.T. or made different arguments at trial, there is not a reasonable probability of a different result. As noted by the superior court, there is no evidence that K.T.'s father ever discussed Nash's molestation in front of K.T., but rather the evidence showed that K.T. told her father about the incident without her father asking about it. K.T.'s own brother observed the incident and testified at trial. Moreover, as noted by the trial court, the jury could reasonably rely on Nash's earlier molestation of E.N. in precisely the same manner as evidence of his culpability regarding K.T. Nash does not show there is a reasonable probability that the jury would have disregarded the abundant evidence of Nash's guilt if his counsel had offered a speculative theory that K.T. may have fabricated the incident when there is no actual evidence to support that theory beyond the general claim that young children sometimes invent incidents that never occurred.

ECF No. 11-26 at 4-5.

At trial, K.T., age 5, stated that she understood she was testifying at trial "[t]o talk more about the bad man" and that "[h]e was touching me . . . At my private." ECF No. 11-6 at 42-43. K.T. stated he had "a long beard" and testified that: "He touched me in my privates." *Id.* at 49, 51. On a provided diagram of a person's body, K.T. circled where the man touched her, which was a location she called "cooter." *Id.* at 53. K.T. stated the man used his finger to touch her. *Id.* at 54. K.T. testified they were laying on the couch and a blanket was "[o]n me and him" which covered "[e]verything" but her head. *Id.* at 55. K.T. stated the man touched her "inside" her pants and "inside" her underwear and that he moved his finger back and forth and "[i]t gave me a scratch." *Id.* at 55-57. On the same provided diagram, K.T. indicated the man also touched her butt and stated he used the same finger. *Id.* at 59-60. K.T. later told her father, said it was "[o]ne of the co-workers he worked with" and that the man ran his hand up her leg to her butt. *Id.* at 61-63.

25-cv-0977-JES-DEB

Blaize, K.T.'s brother, testified that on the evening in question, K.T. "was giving [Petitioner] a hug and then he, liked pulled the blanket over her and him." *Id.* at 113; *see also id.* at 123 (Blaize's identification of Petitioner). Petitioner was then laying on the couch on his back and "[h]er stomach was on his." *Id.* Blaize stated that K.T.'s "entire body" was covered by the blanket during the 5-10 minutes they were under the blanket together, he could not see K.T.'s head, and only Petitioner's head was not covered. *Id.* at 114-15. Blaize saw movement under the blanket during this time, "[a] bunch of, like, he was moving around in the blanket," but it was "impossible" to see what was happening underneath, as K.T. was covered and Blaize could not see Petitioner's hands. *Id.* at 116; *see also id.* at 142-43. Blaize stated that K.T.'s clothing was not in disarray when she got up, "[b]ut when she got up, she fixed her pants," by pulling them up; after [s]he fixed her pants" she then "sat down and watched TV." *Id.* at 129, 136. Blaize did not discuss this with his parents, nor did he hear them discuss it. *Id.* at 130-31.

Shaun T., K.T.'s father, testified he had several individuals, including his co-workers Petitioner and Petitioner's brother, over to his home one evening, and noted that only Petitioner had been on the couch with K.T; when he observed them, Petitioner was laying on the couch under a blanket, K.T. was sitting on the couch, and no one else was in the room. *Id.* at 153-54, 162, 166-68. Shaun stated only two of his children, not including K.T., knew Petitioner by name; K.T. referred to Petitioner as "[m]y co-worker." *Id.* at 154. Then, "almost three weeks" later, Shaun was at his father's home, he spoke to K.T. "[a]bout going to the restroom and that she needed to close the door" and "privacy," after which K.T "said my co-worker stuck his hand down her pants, and that -- that her teacher told her that people shouldn't do things like that." *Id.* at 174. Shaun knew it had been Petitioner "[b]ecause there was only one person there on the couch with her." *Id.* at 175. When Shaun "asked her to explain to me what she was talking about, what did she mean, and then she explained it to me," he testified: "She said he stuck his hands all the way down her pants, reached down her leg and came back up, and he did the same behind, too." *Id.* at 177. Prior to this incident, Shaun had no problems, fights or altercations with Petitioner, nor did his wife. *Id.* at 184.

25-cv-0977-JES-DEB

Shaun also knew Joy and never spoke to her about the K.T. incident, nor did Joy tell him to make up this accusation. *Id.* at 184-85. Shaun only discussed the prior molestation accusation at work, never discussed it at home and he did not tell his wife. *Id.* at 192-93.

Jami T., Shaun's wife and K.T.'s mother, testified that she learned about K.T. and Petitioner from her husband and she cried and then went to the police department to file a report. ECF No. 11-7 at 10, 21-22. Jami said K.T. had been taught in school about "stranger danger and private parts and don't let people touch them" and Jami had also conversed with K.T. about that subject. *Id.* at 22-23. K.T. called her vagina "[c]oochie or cooter" and used the term "butt" for her buttocks. *Id.* at 23. Jami knew Petitioner prior to this matter and neither she nor her husband previously had problems with Petitioner. *Id.* at 25. Jami also knew Joy and had never had a conversation with Joy about K.T.'s disclosure, nor did Joy tell Jami to call the police. *Id.* Jami never spoke to her husband about Petitioner and E.N. and testified: "I don't even know who [E.N.] is" and that "nobody told me anything." *Id.* at 28. Jami also stated that "to the best of her knowledge," her husband, like herself, did not know anything about the E.N. matter. *Id.* at 28-29.

Petitioner contends the state appellate court was unreasonable in concluding there was a lack of prejudice based on the spontaneous nature of the disclosure K.T. made to her father, her brother's testimony about the incident, and the similarities between the incident involving K.T. and the prior one concerning E.N. *See* ECF No. 1-2 at 36. He further asserts that had counsel consulted with a suggestibility expert and conducted additional investigation, the defense could have "undermined" the testimony about the "spontaneous disclosure" and "demonstrated possible points of suggestibility infecting K.T.'s testimony," that trial counsel's failure to impeach Joy "had spillover effects" to this matter, and contends the state court made an unreasonable factual determination when it found that K.T.'s brother observed the molestation. *Id.* at 37-38.

The Court first addresses Petitioner's argument that "the Court of Appeal reasoned that K.T.'s brother Blaize 'observed' the molestation" which "is an unreasonable construction of the record" because "Blaize testified that he saw movement under a blanket

25-cv-0977-JES-DEB

for several minutes but had no way to know what happened underneath" and "[t]his testimony supports at best a speculative inference that sexual touching may have occurred." ECF No. 1-2 at 37. But Petitioner appears to misstate the appellate court's habeas decision, as the state court stated only that K.T.'s brother "observed the incident" and did not indicate the witness had observed a *molestation*. *See* ECF No. 11-26 at 5 ("K.T.'s own brother observed the incident and testified at trial.") Indeed, the state appellate court previously recounted on direct appeal that same witness' testimony and accurately recounted K.T.'s brother testified he saw K.T. and Petitioner under a blanket, saw Petitioner "move around under the blanket for a few minutes," and then "when K.T. got up, she fixed her pants." ECF No. 11-16 at 5. Accordingly, the Court is not persuaded that the state appellate court was incorrect, much less unreasonable, in the respect alleged.

Nor is the Court persuaded that the state court's decision involved an incorrect or unreasonable application of *Strickland*, as the Court agrees with the conclusion of the state appellate court that even presuming trial counsel acted deficiently in failing to consult with a suggestibility expert, Petitioner fails to establish prejudice. *See Mirzayance*, 556 U.S. at 122 ("[A] defendant must show both deficient performance by counsel and prejudice in order to prove that he has received ineffective assistance of counsel."), citing *Strickland*, 466 U.S. at 687.

First, the Court finds reasonable the state court's determination that such expert testimony would have been in support of a "speculative theory" and any resultant defense theory based on suggestibility and fabrication would not have had actual evidentiary support. ECF No. 11-26 at 5. This claim is instead largely premised on the circumstances surrounding K.T.'s disclosure and K.T. herself, but upon review, the proffered evidence and argument before the state court simply present factors which raise questions about the *potential* for suggestibility rather than offering any concrete implication that suggestibility contributed to or affected K.T.'s allegations.

Suggestibility expert Dr. Bradley McAuliff submitted a declaration during state habeas proceedings, *see* ECF No. 11-27, but did not testify at the evidentiary hearing. Dr.

25-cv-0977-JES-DEB

McAuliff stated that he had "serious concerns" about the reliability of K.T.'s allegations given their timing, as those allegations occurred after K.T.'s father learned Petitioner was under investigation, and given the lack of training by those who questioned K.T. *Id.* at 72-73. The expert also noted that K.T. "made several statements" during a pretrial interview which to him "raise[d] concerns about her ability to distinguish between fantasy and reality." *Id.* at 73. Dr. McAuliff also noted K.T.'s young age as a factor in her suggestibility, cited her use of the word "co-worker" with respect to Petitioner, and that K.T. had been questioned by numerous adults during the investigation with direct, rather than open-ended questioning, and there was a lack of recorded prior interviews. *Id.* at 74-75. The expert also raised the possibility of adult misreporting of "prompted responses as being spontaneous." *Id.* at 76. Susan Clemens, an attorney who testified at the hearing as a *Strickland* expert, stated that this case was on the "higher end" of those where she would investigate suggestibility. ECF No. 11-21 at 124. Clemens agreed that in some cases a suggestibility expert could be detrimental but stated that: "I cannot recall defending a case at trial with a child witness without such an expert." *Id.* at 157-58.

As to the timing of K.T.'s allegations and her father's knowledge of the prior allegations against Petitioner, her father Shaun specifically testified at trial that he had not discussed those allegations at home, ECF No. 11-6 at 192-93, and as such, there is no evidence K.T. was ever in a position to possibly overhear information about or otherwise learn of the allegations concerning E.N. Moreover, K.T. use of the term "co-worker" to refer to Petitioner was also addressed and explained at trial, as K.T.'s father Shaun testified that K.T. did not know Petitioner by name as several of his other children did, and she instead referred to Petitioner as Shaun's "co-worker." *Id.* at 154. While the Court cannot discount, in general, the possibility that an adult could misreport a prompted response as being spontaneous, K.T.'s father Shaun testified at trial that his daughter's initial disclosure was in response to him reminding her to close the door to the bathroom for privacy reasons, rather than made in response to any question or inquiry. Petitioner points to nothing tangible that would suggest K.T.'s initial disclosure, which was also quite specific, was

25-cv-0977-JES-DEB

somehow prompted rather than spontaneous. The expert's concerns about K.T.'s age and prior statements, were also brought out at trial and were before the jury to consider. *See e.g.* ECF No. 11-6 at 38 (questions to K.T. about her age and grade in school), *id.* at 73-78 (cross-examination about prior statements); *see also id.* at 88, 92 (prior forensic interview of K.T. played for the jury).

Similarly, K.T.'s testimony concerning events that did not occur that evening, including her testimony that the "bad man" was thrown out of the house that evening, that her sister was also touched by and then slapped the same bad man, and that K.T. screamed for her father that evening, who responded and threw the man out but that the other co-worker stayed, *see* ECF No. 11-6 at 76-78, were also addressed at trial. Both K.T.'s brother Blaize and her father Shaun testified that those events did not occur, including that Blaize and his brothers did not gang up on Petitioner and kick him out of the house, nor did Shaun call the police on Petitioner that evening. *See* ECF No. 11-6 at 137 (Blaize's testimony); *see also id.* at 172-74 (Shaun's testimony). K.T.'s similar prior statements concerning events which did not occur were also brought out at trial. *See* ECF No. 11-6 at 88 (K.T.'s prior forensic interview played for jury); ECF No. 11-1 at 201-02 (in which K.T. indicated that "my dad caught him and then my dad sent him away from my home," that her father's coworker also touched her sister, who slapped him, then all the siblings "formed as a team . . . and slapped him and gave him knuckle sandwich on the head" and fought him.) Moreover, forensic interviewer Sheri Rouse, who interviewed K.T. with respect to this incident, testified she has experienced situations where young children "make up details that they wish may have happened" and Rouse explained "[e]very child is different, but sometimes kids will talk about stopping or fighting or having powers that they don't have to protect themselves." *Id.* at 95-96.

Nor is the Court persuaded by Petitioner's reliance on the Ninth Circuit's decision in *Bemore v. Chappell*, 788 F.3d 1151 (9th Cir. 2015). *See* ECF No. 1-2 at 35. While Petitioner attempts to rely on *Bemore* to assert that trial counsel's "failure to investigate a viable theory that K.T. was never touched, while pursuing a weak theory that petitioner's

25-cv-0977-JES-DEB

brother molested her" constituted prejudicially ineffective assistance, *id.*, the cases are inapposite. First, *Bemore* involved a failure to adequately investigate a weak alibi defense prior to advancing it at trial rather than pursuing an alternative, and potentially viable, mental health defense. *Bemore*, 788 F.3d at 1169. Here, in contrast, even assuming without deciding that the proffered defense at trial was weak, Petitioner fails to persuasively show a suggestibility defense was viable. Instead, Petitioner asserts that "proper" investigation by counsel "would have led him to question whether in a close-knit roofing community K.T.'s father could have learned about the abuse allegation against his coworker" given McGruder stated people at work learned about the accusations and that Shaun T. asked him about the E.N. allegations *after* reporting K.T's disclosure to police. *See* ECF No. 1-2 at 36. Petitioner additionally speculates that had Shaun known of the E.N. allegations, "he may have knowingly or unknowingly communicated to his daughter" information which would undermine the trial evidence suggesting a spontaneous disclosure. *Id.* at 37. But as it stands, Petitioner's proffered suggestibility defense relies largely on supposition and speculation rather than on actual, tangible evidence. That Shaun may have known of the E.N. allegations at some point and that he asked McGruder about them *after* reporting K.T.'s allegations fail to reasonably raise an implication that Shaun spoke of the allegations at home (contrary to his specific denial at trial), much less that he somehow directly or indirectly influenced K.T. to make allegations.

Additionally, and of more importance to the instant analysis, in *Bemore* the Ninth Circuit found no *guilt phase* prejudice from trial counsel's failure to investigate and granted habeas relief only with respect to the related *penalty* phase claim of ineffective assistance of counsel for failure to present the mental health evidence in mitigation. *See Bemore*, 788 F.3d at 1169-76. In so deciding, the Ninth Circuit specifically noted a different analysis was applicable with respect to a *penalty* phase claim of ineffective assistance, stating: "For Bemore to have avoided the death penalty, only one juror need have been persuaded by mitigating evidence to show mercy and vote against a capital sentence. So Bemore need only show that counsel's errors were 'sufficient to undermine confidence in the outcome'

25-cv-0977-JES-DEB

reached by a single juror." *Id.* at 1176, quoting *Strickland*, 466 U.S. at 694. Accordingly, Petitioner fails to persuasively show *Bemore* assists his claim.

Given the evidence concerning K.T.'s disclosure and the arguments presented here appear to raise only speculative concerns about the potential for suggestibility, and in view of the trial evidence which appears to have touched on or addressed several of the concerns raised by the proffered suggestibility expert, the Court is not persuaded that Petitioner has shown advancing a suggestibility defense would have affected the outcome of the proceedings, much less that such a defense would have had any reasonable probability of a different result at trial. *See Strickland*, 466 U.S. at 694 ("A reasonable probability is a probability sufficient to undermine confidence in the outcome."); *see also Richter*, 562 U.S. at 112 ("The likelihood of a different result must be substantial, not just conceivable.")

As such, the Court is again in accord with the conclusion of the state court that even assuming deficient performance, this claim also fails for lack of prejudice.[7] *See* ECF No. 11-26 at 4 ("[E]ven if Nash's counsel had introduced additional evidence regarding the suggestibility of K.T. or made different arguments at trial, there is not a reasonable probability of a different result."); *see also Mirzayance*, 556 U.S. at 122 ("[A] defendant must show both deficient performance by counsel and prejudice in order to prove that he has received ineffective assistance of counsel."), citing *Strickland*, 466 U.S. at 687. This is

---

[7] Petitioner also cites to and relies upon a recent habeas decision, *Ward v. Cates*, 2024 WL 4406940 (C.D. Cal. Aug. 22, 2024), which he contends "demonstrates by way of contrast how [trial counsel's] failure to investigate a suggestibility defense fell far short of constitutional requirements." ECF No. 1-2 at 33. However, Petitioner plainly relies on *Ward* to argue trial counsel rendered *deficient performance* in failing to consult a suggestibility expert, *see id.* at 33-34, the *Ward* Court ultimately rejected the claim of ineffective assistance, finding a lack of demonstrated *prejudice. See Ward*, 2024 WL 44040, at * 19 ("[T]he Court cannot find that every fairminded jurist would conclude there was a reasonable probability of a different result if defense counsel had presented expert testimony on childhood suggestibility.") (citations and footnote omitted). Because this Court's decision, like that of the state court, turns on the prejudice prong, the Court finds *Ward* of minimal support to Petitioner's claim of ineffective assistance.

because Petitioner again fails to show "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.

Accordingly, Petitioner fails to show the state court decision was contrary to or an unreasonable application of clearly established federal law under *Strickland*. *See Richter*, 562 U.S. at 101 ("The pivotal question is whether the state court's application of the *Strickland* standard was unreasonable."); *see also Mirzayance*, 556 U.S. at 122, citing *Strickland*, 466 U.S. at 687. Petitioner also fails to show that the state court's decision was based on an unreasonable factual determination. Thus, federal habeas relief is not available on Claim 2.

## V.   CERTIFICATE OF APPEALABILITY

"The district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." R. 11(a), Rules Governing Section 2254 Cases (2019). "A certificate of appealability should issue if 'reasonable jurists could debate whether' (1) the district court's assessment of the claim was debatable or wrong; or (2) the issue presented is 'adequate to deserve encouragement to proceed further.'" *Shoemaker v. Taylor*, 730 F.3d 778, 790 (9th Cir. 2013), quoting *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

Under this standard, the Court grants a certificate of appealability limited solely to Claim 1, as the Court finds that "'reasonable jurists could debate whether' . . . the issue presented is 'adequate to deserve encouragement to proceed further.'" *Id.*, quoting *Slack*, 529 U.S. at 484.

///

///

///

///

///

///

25-cv-0977-JES-DEB

## VI.   CONCLUSION AND ORDER

For the reasons discussed above, the Court **DENIES** the Petition for a Writ of Habeas Corpus and **ISSUES** a certificate of appealability limited to Claim 1.

**IT IS SO ORDERED.**

Dated:  March 18, 2026

_____
Honorable James E. Simmons Jr.
United States District Judge

25-cv-0977-JES-DEB